**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **CAPSTAR FINANCIAL HOLDINGS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 3:17-cv-01421** |
| **v.** ) | **Judge Aleta A. Trauger** |
| ) | |
| **GAYLON M. LAWRENCE and THE LAWRENCE** ) | |
| **GROUP,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendants Gaylon M. Lawrence, Jr. ("Mr. Lawrence") and The Lawrence Group[1] (collectively "Lawrence" or "Defendants") hereby file this Memorandum in Support of their Motion to Dismiss the Complaint filed by CapStar Financial Holdings, Inc. ("CapStar" or "Plaintiff").

## INTRODUCTION

This lawsuit is not about irreparable harm to CapStar (there is no irreparable harm to CapStar) or misrepresentations by Mr. Lawrence in his public filings (there are no misrepresentations). No, this lawsuit is CapStar's current Chairman of the Board of Directors Dennis C. Bottorff's ("Denny Bottorff") attempt to intimidate Mr. Lawrence and to deter him from individually acquiring additional CapStar stock. Denny Bottorff is trying to use this case as a tool to protect his own power and position at CapStar, to the detriment of the bank and its shareholders. The cases discussing Section 13(d) of the Exchange Act (known as the Williams

---

[1] Defendant Gaylon M. Lawrence objects to the inclusion of The Lawrence Group as a separate entity or as a properly named defendant in this action.

Act), which Plaintiff claims forms the basis for this suit, warn against the use of the Williams Act by "directors of corporations, who clearly have an economic interest in protecting their own positions, to use corporate resources simply to harass and burden aggressive outsiders." *Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1519 (11th Cir. 1985). Mr. Lawrence is confident that the Court will not be duped by the Complaint's half-truths and false innuendo, which were put forward solely for the purpose of harassing and burdening Mr. Lawrence. This Motion sheds light on the full, objective facts evidenced by the black-and-white disclosures set forth in Mr. Lawrence's public filings (the contents of which Plaintiff cherry picked and took out of context but chose not to attach to the Complaint). Taking the factual allegations as true, and ignoring Plaintiff's unsupported legal conclusions, the Complaint fails to plead sufficient facts to state a plausible claim for relief. CapStar's Complaint should, therefore, be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF FACTS

This action arises out of a series of acquisitions of CapStar stock by Mr. Lawrence, an individual investor, in the latter half of 2017. (Compl. ECF No. 1, ¶¶ 3-4.) In connection with these acquisitions, as set forth below, Mr. Lawrence made the requisite filings with the Securities and Exchange Commission ("SEC") under Section 13(d) of the Exchange Act of 1934, and provided notification to the Federal Reserve pursuant to the federal Change in Bank Control Act of 1978.

Upon acquiring greater than five percent (5%) of the outstanding stock of CapStar, Mr. Lawrence made his first Schedule 13D filing with the SEC on August 11, 2017 ("Schedule 13D Disclosure"). (Compl., ECF No. 1, ¶ 21.) A true and correct copy of that filing is attached to the

Declaration of Gaylon M. Lawrence, Jr. ("Lawrence Decl.") (ECF No. 20) as Exhibit 1.[2]

Pursuant to his Schedule 13D Disclosure, Mr. Lawrence publicly stated that he had acquired 6.2% of the outstanding common stock of CapStar. (*Id.*; Compl., ECF No. 1, ¶21.) As set forth in Item 4 of the Schedule 13D Disclosure, Mr. Lawrence provided the following statement with regard to the purpose of the transaction:

> The Reporting Person [Mr. Lawrence] acquired the securities described in this Schedule 13D for investment purposes, and he intends to review his investments in the Issuer on a continuing basis. Any actions the Reporting Person might undertake may be made at any time and from time to time without prior notice and will be dependent upon the Reporting Person's review of numerous factors, including, but not limited to: an ongoing evaluation of the Issuer's business, financial condition, operations and prospects; price levels of the Issuer's securities; general market, industry and economic conditions; the relative attractiveness of alternative business and investment opportunities; and other future developments.
>
> **Depending upon overall market conditions, other investment opportunities available to the Reporting Person, and the availability of the Issuer's securities at prices that would make the purchase and sale of the Issuer's securities desirable**, the Reporting Person may acquire additional securities of the Issuer, or retain or sell all or a portion of the securities then held, in the open market or in privately negotiated transactions.
>
> The Reporting Person and his representatives may, from time to time, engage in discussions with members of management and the board of directors of the Issuer (the "Board"), other current or prospective shareholders, industry analysts, existing or potential strategic partners, investment and financing professionals and other third parties regarding a variety of matters related to the Issuer, which may include, among other things, the Issuer's business, management, capital structure and allocation, corporate governance, Board composition and strategic alternatives. **Except as set forth above**, the Reporting Person has no present plans or proposals which relate to or would result in any of the transactions required to be described in Item 4 of Schedule 13D.

(Schedule 13D Disclosure, Lawrence Decl., ECF No. 20, Ex. 1, p. 3) (emphasis added).

---

[2] "When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007).

3

Subsequent to filing his original Schedule 13D Disclosure (and consistent with his disclosure that he may acquire additional securities of CapStar if conditions were desirable), Mr. Lawrence purchased additional CapStar securities, and made the requisite amended Schedule 13D filings with the SEC. (Compl., ECF No. 1 ¶¶ 22, 23.) Mr. Lawrence filed an Amended Schedule 13D ("Amendment No. 1") on August 25, 2017, which referenced the original Schedule 13D Disclosure and indicated that he had acquired a total of 7.2% of the outstanding common stock in CapStar. (Compl., ECF No. 1, ¶ 22.) A true and correct copy of Amendment No. 1 is attached to the Lawrence Decl. as Exhibit 2. (Lawrence Decl., ECF No. 20, ¶ 5, Ex. 2.)

On September 13, 2017, Mr. Lawrence filed an Amended Schedule 13D ("Amendment No. 2"), referring to the Schedule 13D Disclosure and Amendment No. 1, and indicating that Mr. Lawrence had acquired a total of 8.2% of the outstanding common stock of CapStar. (*Id.* at ¶ 8.; Compl., ECF No. 1, ¶ 23.) A true and correct copy of Amendment No. 2 is attached to the Lawrence Decl. as Exhibit 3. (Lawrence Decl., ECF No. 20, ¶ 8, Ex. 3.)

Again, consistent with his disclosure that he may purchase additional shares of CapStar stock if the market conditions were favorable, Mr. Lawrence then purchased additional shares and filed an Amended Schedule 13D ("Amendment No. 3") on October 4, 2017, wherein he disclosed that he had acquired a total of 9.2% of the outstanding shares of CapStar stock. (*Id.* at ¶ 10; Compl., ECF No. 1, ¶ 23.) A true and correct copy of Amendment No. 3 is attached to the Lawrence Decl. as Exhibit 4. (Lawrence Decl., ECF No. 20, ¶ 10, Ex. 4.)

Finally, Mr. Lawrence filed an Amended Schedule 13D on October 17, 2017 ("Amendment No. 4"), referencing the Schedule 13D Disclosure and prior amendments, and indicating that he had acquired a total of 10.2% of the outstanding stock of CapStar. (*Id.* at ¶ 12;

4

Compl., ECF No. 1, ¶ 23.) A true and correct copy of Amendment No. 4 is attached to the Lawrence Decl. as Exhibit 5. (Lawrence Decl., ECF No. 20, ¶ 12, Ex. 5.)

Each of the purchases identified in the original Schedule 13D Disclosure and the amendments thereto were in the name of Mr. Lawrence individually and personally, and not indirectly through any other entity or for the benefit of anyone or any entity other than Mr. Lawrence himself. (Lawrence Decl., ECF No. 20 ¶ 3; Schedule 13D Disclosure, Lawrence Decl., ECF No. 20, Ex. 1, Item 5, p. 4; Amendment No. 1, Lawrence Decl., ECF No. 20, Ex. 2, Item 5, p. 3; Amendment No. 2, Lawrence Decl., ECF No. 20, Ex. 3, Item 5, p. 3; Amendment No. 3, Lawrence Decl., ECF No. 20, Ex. 4, Item 5, p. 3; Amendment No. 4, Lawrence Decl., ECF No. 20, Ex. 5, Item 5, p. 3.)

## STANDARD OF REVIEW

A complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, that statement "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Complaint requires more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of further factual enhancement." *Id*. (quoting *Twombly*, 550 U.S. at 570).

"[T]he complaint must contain enough facts to establish a 'plausible,' as opposed to merely a 'possible,' entitlement to relief. *Harps v. TRW Auto. U.S., LLC*, 351 Fed. App'x 52, 56 (6th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

5

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Plausibility" requires more than a "sheer possibility that a defendant has acted unlawfully." *Id*. In determining whether a plaintiff has alleged sufficient plausibility, a court must first disregard allegations that are mere legal conclusions and then determine if sufficient facts have been alleged to create a plausible claim. *See Id*. at 678-679. If such facts have not been alleged, the complaint must be dismissed. *Id*. This pleading standard applies to all civil actions in United States District Courts. *Id*. at 684; *see also Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 609, n. 4 (6th Cir. 2009). A complaint which fails to state a claim against the defendant should be dismissed. Fed. R. Civ. P. 12(b)(6).

## LAW AND ARGUMENT

### I. CAPSTAR'S SECTION 13(d) CLAIMS FAIL AS A MATTER OF LAW.

#### A. Section 13(d) of the Securities and Exchange Act of 1934.

Section 13(d) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(d) is one of the "Williams Act" amendments of 1968. *Piper v. Chris-Craft Industries*, 430 U.S. 1, 22 (1977). The purpose of the Williams Act was to protect investors in target corporations from takeover bidders who up to that point had been able to operate in secrecy. *See id.* at 26-29. Congress did not enact the Williams Act to protect either the tender-offeror or the target corporation but, rather, intended to maintain a neutral posture between the takeover bidder and existing management. *See id.* at 30-31. The Williams Act was designed solely to get needed information to the investor. *Id.* at 31; *see also Florida Commercial Banks*, 772 F.2d at 1515 (citing S. Rep. No. 550, 90th Cong., 2st Sess. 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2s Sess. 3, *reprinted in* 1968 U.S. Code Cong. & Ad. News 2811, 2813).

Section 13(d) requires that anyone who acquires more than five percent (5%) of any class of equity securities of a company registered with the SEC file a Schedule 13D statement with the

6

SEC and the issuing company setting forth: (1) the background and identity of the purchaser; (2) the source of the funds used to purchase the securities; (3) if the purpose of the acquisition is to acquire control of the business of the issuer, any plans or proposals which such person may have to liquidate such issuer, to sell its assets to or merger with any other persons,, or to make any other major changes in its business or corporate structure; 4) the number of shares beneficially owned by the purchaser; and 5) information as to any contracts, arrangements, or understandings with respect to such securities. 15 U.S.C. § 78m(d)(1)(A)-(E). In judging the accuracy of a Schedule 13D statement, "fair accuracy, not perfection, is the standard." *Hubco, Inc. v. Rappaport*, 628 F.Supp. 345, 359 (D. C. N. J. 1985) (citing *Purolator, Inc. v. Tiger Int'l, Inc.*, 510 F. Supp. 554, 556 (D. D.C. 1981); *Laurenzano v. Einbender*, 448 F.2d 1, 6-7 (2d Cir. 1977)).

CapStar's Section 13(d) claims fail for three primary reasons. First, a plain reading of Mr. Lawrence's Schedule 13D Disclosure and Amendment Nos. 1-4 reveals that Mr. Lawrence disclosed to the marketplace all of the information required to be disclosed under Section 13(d). Second, even if the facts could plausibly support an alleged violation of Section 13(d) (which they do not), CapStar is not entitled to the relief requested in the Complaint, in whole or in part, because there is no private right of action available to CapStar for all, or part, of the relief requested. Third, even if CapStar does have some limited private right of action for certain types of injunctive relief under the Act, CapStar has failed to allege any irreparable harm and is, thus, not entitled to injunctive relief as a matter of law. For these reasons, CapStar has failed to allege facts plausible to give rise to a claim under Section 13(d), and these claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

On Its Face, Mr. Lawrence's Schedule 13D Filings Publicly Disclose The Very Information CapStar Alleges Mr. Lawrence Was Trying To Hide.

Mr. Lawrence's Schedule 13D Disclosure and subsequent Amendment Nos. 1-4 fully disclosed all of the information required to be provided under Section 13(d). Specifically, Mr. Lawrence expressly stated his intentions with regard to the circumstances in which he would purchase additional CapStar stock and his intentions with regard to what he would do as a shareholder owning more than five percent (5%) of CapStar stock.

CapStar claims that Mr. Lawrence's Schedule 13D Disclosure and subsequent amendments "misled the market by falsely claiming he had no plan to acquire control of CapStar or to purchase additional shares" in CapStar. (Compl., ECF No. 1 ¶¶ 4, 21, 42-46.) (emphasis added). This allegation is plainly false when one looks at the full disclosure referenced in the Complaint. CapStar focuses on only one incomplete portion of a phrase contained in Mr. Lawrence's Schedule 13D Disclosure: "But under Item 4, Lawrence indicated that he had acquired the shares for 'investment purposes' and 'ha[d] no present plans or proposals' to acquire control of CapStar or purchase additional shares." (*Id.* at ¶ 21.) In making this allegation, CapStar cherry picks language mid-sentence and seeks to mislead the Court by not describing the full disclosure set forth in the Schedule 13D Disclosure wherein Mr. Lawrence tells the world that if the market conditions and share price are desirable, he "may acquire additional shares of [CapStar]." (Schedule 13D Disclosure, Lawrence Decl., ECF No. 20, Ex. 1, Item 4.)

As the second paragraph of the full disclosure in Item 4 (which is fully set forth in the Statement of Facts above) states: "**Depending upon overall market conditions, other investment opportunities available to [Mr. Lawrence], and the availability of [CapStar's] securities at prices that would make the purchase or sale of [CapStar's] securities desirable, [Mr. Lawrence] may acquire additional securities of the Issuer** …." (Schedule 13D

Disclosure, Lawrence Decl., Ex. 1, p. 3) (emphasis added). Accordingly, Mr. Lawrence informed the world in this filing that he may acquire additional securities if he determines that the overall market conditions and stock price are favorable for the purchase of additional securities.[3] The Complaint completely ignores this language in its entirety -- language that is directly *above* the cherry-picked phrase that Plaintiff takes out of context to mislead the Court.

Additionally, Mr. Lawrence informed the world in the next paragraph of Item 4 of his intentions with regard to his position as a shareholder of more than five percent (5%) of the shares of CapStar:

> [Mr. Lawrence] and his representatives may, from time to time, engage in discussions with members of management and the board of directors of [CapStar] (the "Board"), other current or prospective shareholders, industry analysts, existing or potential strategic partners, investment and financing professionals and other third parties regarding a variety of matters related to the Issuer, **which may include, among other things, the Issuer's business, management, capital structure and allocation, corporate governance, Board composition and strategic alternatives. Except as set forth above**, the Reporting Person has no present plans or proposals which relate to or would result in any of the transactions required to be described in Item 4 of Schedule 13D.

(*Id.*) (emphasis added). Again, CapStar does not include this portion of the Schedule 13D Disclosure in its Complaint, which is necessary to *accurately* portray the disclosures that Mr. Lawrence made.

Instead, CapStar focuses solely on only *a portion* of the last sentence of the paragraph above, *i.e.*, "… the Reporting Person has no present plans or proposals …" in support of its claim

---

[3] Moreover, Exhibit A to the disclosure identifies each of Mr. Lawrence's purchases from June 12, 2017 through August 11, 2017, including the number of shares purchased and the weighted average price per share. (Id. at Ex. A.) Any shareholder or prospective shareholder who was curious about the price at which Mr. Lawrence might consider purchasing additional shares of CapStar stock would likely find this historic information very valuable. However, the reality of the marketplace is that share price, market factors, and Mr. Lawrence's own investment portfolio and needs are fluid and change constantly. His disclosure regarding what factors he would consider in whether he would choose to purchase additional shares of CapStar stock on a going forward basis were fully disclosed. That he continued to evaluate those conditions, the share price, and his portfolio and decided to purchase additional shares following the filing of the Schedule 13D Disclosure is not evidence of anything other than Mr. Lawrence making decisions in exactly the manner in which he disclosed he would.

9

that Mr. Lawrence was somehow trying to mislead the marketplace. CapStar conveniently leaves out any reference to the modifying clause at the beginning of the last sentence of the disclosure: "**Except as set forth above**, the Reporting Person has no present plans or proposals which relate to or would result in any of the transactions required to be described in Item 4 of Schedule 13D." The modifying language "[e]xcept as set forth above" expressly refers to the specific disclosures regarding his intentions to purchase additional shares of CapStar if market conditions and stock price are desirable as well as his intentions regarding his position as a shareholder of greater than five percent (5%) of CapStar's stock.

A logical reader could not review the Schedule 13D Disclosure in its entirety and conclude that Mr. Lawrence would not purchase additional shares of CapStar if market conditions and stock price were favorable, or fail to understand that he might use his position as a shareholder of greater than five percent (5%) to engage in discussions with management, the Board, or others about the affairs of CapStar, including its "corporate governance, Board composition and strategic alternatives." Mr. Lawrence, by making this disclosure and then amending it four times in the months that followed to reflect additional purchases of one percent (1%) of CapStar stock (including the weighted average price for each purchase), expressly informed the world of everything CapStar alleges Mr. Lawrence tried to hide.[4] In viewing the disclosures for "fair accuracy" it is clear that Mr. Lawrence made the necessary material disclosures required by Section 13(d).

---

[4] With regard to CapStar's claims regarding Mr. Lawrence's disclosures regarding acquiring control of CapStar, subsection (1)(C) of Section 13(d) requires the following disclosure: "if the purposes of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals … to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure." 15 U.S.C. § 78m(d)(1)(C). CapStar does not allege that Mr. Lawrence has any plans or proposals to liquidate CapStar, sell its assets to or merger it with any other persons, or to make any other major change in its business or corporate structure. Therefore, there can be no violation of Section 13(d)(1)(C) here.

CapStar argued in its proposed Reply in Support of Motion for Expedited Discovery that it is insufficient to tell the world that he <u>may</u> purchase additional shares if market conditions and the stock price are desirable. However, it is not clear what else CapStar would have had Mr. Lawrence say. A statement with any more specificity would have been speculative and potentially misleading (e.g., a statement that he planned to acquire additional shares could have ended up being false if the stock price rose, market conditions changed, or his own investment needs changed, and he did not purchase any additional shares). *See Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969) ("It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them"); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 187 (2d Cir. 2014) (quoting same); *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 567 (11th Cir. 1984) (quoting same); *Chromalloy v. Am. Corp. v. Sun Chem. Corp.*, 611 F.2d 240, 248 (8th Cir. 1979) (quoting same); *Rosen v. Brookhaven Cap. Mgmt. Co., Ltd.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000) (quoting same). Moreover, there is no requirement to disclose at which price he viewed CapStar's stock prices to be desirable. *See Morrison Knudsen Corp. v. Heil*, 705 F. Supp. 497, 503 (D. Idaho 1988) ("M-K has further argued that Heil should disclose that he believes that M-K stock is attractive at prices around $40.00 per share. The Court, however, can find no authority mandating such a disclosure and will not so require"). Further, as set forth above, the Schedule 13D Disclosure and each of the four Amendments thereto disclose the date of each purchase, the number of shares purchased, and the weighted average purchase price for each of the purchases, giving the world a historical perspective on the conditions that led to Mr. Lawrence's purchases in the first place.

11

A plain reading of Mr. Lawrence's Schedule 13D Disclosure and Amendment Nos. 1-4 reveals that Mr. Lawrence did not mislead the marketplace and did not violate Section 13(d) as a matter of law. It is simply not plausible, when reviewing the disclosures in their entirety (as opposed to one cherry-picked portion of one incomplete phrase), to conclude that CapStar can maintain a claim against Mr. Lawrence for violating Section 13(d). CapStar's Section 13(d) claim thus fails and should be dismissed.

C.  CapStar Does Not Have A Private Right Of Action For The Bulk Of The Relief It Requests Under Section 13(d).

Even if CapStar could establish facts that make it plausible that Mr. Lawrence's Section 13(d) disclosures were misleading (which they cannot), CapStar does not have a private right of action for the bulk of the relief it requests under Section 13(d).

1.  CapStar has no private right of action for its claim for monetary damages.

In its prayer for relief, CapStar requests monetary damages. (Compl. ECF No. 1 ¶ i.) Specifically, in Paragraph (i) of its Prayer for Relief, CapStar requests "such other and further relief as is just and appropriate, including, in the alternative, an award of damages." (*Id.*) It is clear, however, that CapStar does not have a private right of action under Section 13(d) for monetary damages. *See Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008) ("No other Circuit has found a private right of action for money damages under Section 13(d)."); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002) (same); *Liberty Nat. Ins. Holding Co. v. Charter*, 734 F.2d 545, 564 n.1 (11th Cir. 1984) (same); *Ryhne v. Omni Energy Servs. Corp.*, No. 08-CV-00594, 2009 WL 1844474, at *8 (W.D. La. June 23, 2009) ("All claims for damages based upon the defendants' alleged violations of 13(d) must be dismissed, as it provides no private right of action for damages.") Accordingly, CapStar's claims for monetary damages must be dismissed as a matter of law.

12

2. CapStar likewise does not have a private right of action for injunctive relief requiring Mr. Lawrence to divest his shares.

CapStar also seeks an Order requiring Mr. Lawrence to divest, or dispose of, shares of CapStar stock that CapStar alleges Mr. Lawrence obtained "in violation of federal and state law and restrain any further purchases of CapStar shares until defendant comply with the law." (Compl., ECF No. 1, ¶ f, p. 17.) CapStar does not have a private right of action for this claimed relief either. No Sixth Circuit case has dealt with this specific issue. The 11th Circuit has held that Congress's intent in passing the Williams Act would be thwarted by allowing incumbent management of the issuer to seek divesture of stock of larger purchasers. *See Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1519 (11th Cir. 1985) ("The harm caused by divestiture, in addition to the harm caused by the potential misuse of the private cause of action by incumbent management, clearly would outweigh the benefit that private enforcement … would provide to the shareholders."); *Liberty National*, 734 F.2d at 567 ("The creation of a private right of action on behalf of the firm would allow incumbent management to use corporate resources, rather than their own, to harass and burden aggressive outsiders").

The significance of this type of remedy was discussed by the court in *Florida Commercial Banks*:

> Congressional intent not to imply the right of action [issuer] has brought is also made apparent when one focuses on the particular injunctive remedy [issuer] seeks [divestiture of shares]: it is both inappropriate and lacking in proportion to the wrong alleged. Section 13(d) creates an affirmative duty in a person after he has acquired more than five percent of the shares of an issuer to file a form for purely informational purposes. It strikes us that the obvious antidote for an allegedly false filing is a corrected filing. Yet [issuer] does not request such a remedy. Instead, it seeks to force a major stockholder to unload its vast holdings and to lose its voting power over the shares it owns. The primary effect of such relief, if granted, would be to lower the market price of [issuer's] shares, which plainly would not be beneficial to shareholders. This result would be plainly contrary to congressional intent in adopting the Williams Act.

13

*Id.* (quoting *Liberty National*, 734 F.2d at 565). The *Florida Commercial Banks* court further criticized divestiture of stock as being against Congressional intent behind passing the Williams Act: "The harm caused by divestiture, in addition to the harm caused by the potential misuse of the private cause of action by incumbent management, clearly would outweigh the benefit that private enforcement of the Williams Act would provide to the shareholders." *Id.* at 1519. In short, divestiture of shares "would be inconsistent with the purposes of the Williams Act." *Id.*

The Eleventh Circuit's prior decision in *Liberty National* discussed the legislative intent behind the Williams Act and the contravening effect on Congress's intent of allowing an issuer to obtain divestiture relief:

> The Williams Act dealt mainly with tender offers. It is clear from the legislative history that the framers of the Williams Act sought to "take extreme care to avoid tipping the balance of regulation either in favor of management or in favor making the takeover bid," and that their goal was to promote "full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to present their case." … To permit the issuer to oust the new stockholder simply because he made a false filing would tip the balance towards management, thereby injuring the existing investors. Moreover incumbent management could solidify its position by subjecting to suit any outsider who accumulated more than 5% of the shares of the company, and thus discourage such accumulations. The threat of this sort of litigation might remove from the field a player whose self-interest is to monitor management, and who is poised to mount a proxy fight or a tender offer.

*Liberty National*, 734 F.2d at 566. The court went on to discuss the conflict between current management, whose interest is to protect its own economic interest and power within the company, and the shareholders:

> While Section 13(d) is intended to ensure the provision of information to the market through the Commission, the exchanges and management, and it is the investors who are the intended beneficiaries of this legislation, the relief requested by the issuer [divestiture], here, is at best ambiguous, even in its immediate effect on the shareholders. Requiring that [purchaser] divest itself of [issuer's] shares, by selling them back to non-parties or on the open market, will depress the price, by increasing the supply of [issuer's] shares on the market without a corresponding increase in the demand. Removing voting power from [the purchaser] will have the effect of removing outside monitoring of management by

14

a shareholder with significant financial interest in policing management. Thus, the divestiture remedy sought by the "issuer" illustrates only too well that the interests of shareholders and management are not likely to be identical with regard to policing schedule 13D filings.

*Id.* The *Liberty National* court concluded:

> The creation of a private right of action on behalf of the firm [for divestiture] would allow incumbent management to use corporate resources, rather than their own, to harass and burden and burden aggressive outsiders. Moreover, it would be difficult for the outsider to avoid vexatious litigation by any manner of careful craftsmanship in his filing; all the incumbent management would have to demonstrate to maintain its claim for relief would be that the outsider's schedule 13D statement of his intentions with respect to the issuer was false or misleading. Whether the outsider is unequivocal or equivocates as to his intentions, the issuer could simply allege, as Liberty did in this case, that his true intentions are the opposite. As Judge Friendly pointed out in one of the first cases to construe the Williams Act, "It would be as serious an infringement of these regulations [for the outsider] to overstate the definiteness of [it]s plans as to understate them.

*Id.* at 567 (quoting *Electronic Specialty Co.*, 409 F.2d at 948). Because the chilling effect and deleterious impact on the market of allowing an issuer to seek divestiture of shares for an alleged false or misleading Schedule 13D disclosure, the Eleventh Circuit held there was no private right of action to seek divestiture of the shares. *Id.*

Additionally, courts like the Fifth Circuit have found that injunctive relief is not available to issuers, like CapStar who are concerned with "creeping takeover" by a large shareholder. (Compl., ECF No. 1, ¶ 4) ("… in an effort to conceal his creeping takeover efforts from investors.") In *Gearhart Indus. v. Smith Int'l*, 741 F.2d 707 (5th Cir. 1984), the Fifth Circuit held that, while there is a private right of action under Section 13(d) for certain forms of injunctive relief, the issuer in that case was not entitled to injunctive relief because injunctive relief as too drastic and unnecessary to deal with a creeping control issue. The *Gearhart* court stated that, to the extent injunctive relief is permitted under Section 139d), it is "drastic medicine" and "should be carefully tailored to the situation presented and should be no broader than necessary to accomplish the purpose of the court in granting it." 741 F.2d at 715. The court held that "[t]he

15

*sole* purpose of the Williams Act is full and fair disclosure to investors, and in crafting that Act Congress was at extreme pains to avoid 'tipping the scales either in favor of management or in favor of the person making the takeover bids.'" *Id.* (citing *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 31 (1977)). "Insofar as the injunction is made to rest on disadvantage created to [] management's resistance to the takeover, the Williams Act does not support it." *Id.* The court cited to the Second Circuit's opinion in *Treadway Companies, Inc. v. Care Corp.*:

> The goal of § 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities … which might represent a potential shift in corporate control. *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied* 406 U.S. 910 (1972). But as the Supreme Court noted in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975), "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. [citations omitted]. Thus, an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. *Rondeau v. Mosinee Paper Corp., supra*. Those interests for fully satisfied when the shareholders receive the information required to be filed. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977).

*Gearhart*, 741 F.2d at 715 (quoting *Treadway Companies*, 638 F.2d 357, 380 (2d Cir. 1980)). The *Gearhart* court found that injunctive relief was far too drastic a remedy in the context of the creeping takeover, and, therefore, held that the issuer could not maintain its claim for injunctive relief enjoining the tender offer. *Id.* at 716.

These courts are not alone in taking a dim view of injunctive relief under Section 13(d). While, as the next section demonstrates, courts are willing to consider injunctive relief requiring corrected Schedule 13D disclosures if there is a material misstatement or omission, they are not willing to grant injunctive relief beyond that, such as rescission or "sterilization" of shares, i.e., stripping the shares of their voting rights. *See*, *e.g.*, *Dan River, Inc. v. Icahn*, 701 F.2d 278, 287 (4th Cir. 1983) (court would not order "sterilization" of shares due to prior insufficient disclosure); *Treadway Companies*, 638 F.2d at 380; *Chromalloy American Corp. v. Sun*

16

*Chemical Corp.*, 611 F.2d 240, 248-49 (8th Cir. 1979) (court would not require "cooling-off" period after submission of corrected Schedule 13D); *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97-98 (1st Cir. 1977) (court would not enjoin defendants from voting legally acquired shares after § 13(d) violation); *Hubco*, 628 F.Supp. at 354 (D. C. N. J. 1985) (no injunctive relief for rescission or preventing future purchases of stock); *compare Hanna Mining Company v. Norcen Energy Resources Ltd.*, 574 F.Supp. 1172, 1197 (N.D. Ohio 1982) (injunction imposed for issuer preventing proposed tender offer until shareholders who sold shares during period of ongoing Section 13(d) violations were offered rescission).

The instant lawsuit is the perfect demonstration of the courts' concern in allowing injunctive relief for divestiture to proceed under Section 13(d). Here, CapStar's management, in particular Denny Bottorff (himself being one of the larger shareholders of the company), is using corporate resources to bring suit against Mr. Lawrence criticizing Mr. Lawrence's Schedule 13D Disclosure by cherry picking a portion of one sentence in its pleading and claiming the disclosure was, therefore, misleading. Mr. Lawrence, in his full disclosure, provided the investing public with complete information about his true intentions and how he would go about evaluating whether to purchase additional stock and what he would do with the stock he had already purchased. Denny Bottorff's use of the bank's corporate resources to not only try to deter and prevent Mr. Lawrence from acquiring a significant interest in the bank, but also to divest him of the shares he has already purchased is expressly contrary to the intent of Congress in passing the Williams Act and is harmful to the shareholders of CapStar. This case best demonstrates why there should be no private right of action by issuers against purchasers for divestiture of shares under Section 13(d). The Court should, therefore, dismiss CapStar's claim for injunctive relief seeking divestiture of Mr. Lawrence's prior purchases of CapStar stock.

17

3. The only relief potentially available to CapStar is injunctive relief requiring amendment of the Schedule 13D Disclosures, but because those disclosures accurately represent Mr. Lawrence's intentions, CapStar's claim for this relief fails.

The only potential relief available to CapStar under Section 13(d) is injunctive relief requiring amendment to the Schedule 13D disclosures in the event of a finding that there is incorrect information contained therein. *See Florida Commercial Banks*, 772 F.2d at 1519; *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1224 (4th Cir. 1980) (trial court's decision to require amendment was appropriate injunctive relief); *Hubco*, 628 F.Supp. at 354 (D. C. N. J. 1985) (effectively the only relief available to an issuer under Section 13(d), according to the prevailing view, is an order requiring a curative disclosure). As the *Florida Commercial Bank* court cautioned, however, "[b]y providing issuers with this cause of action to enforce the Williams Act, this Court does not intend to allow the directors of corporations, who clearly have an economic interest in protecting their own positions, to use corporate resources simply to harass and burden aggressive outsiders." *Florida Commercial Banks*, 772 F.2d at 1519.

Here, as set forth above, the language contained in Mr. Lawrence's Schedule 13D Disclosure is completely accurate and fully discloses Mr. Lawrence's intentions regarding purchasing additional shares of CapStar stock and exercising his rights as a shareholder. It would be misleading to the marketplace to require any different disclosures. In fact, as the cases cited above demonstrate, it would be misleading to the marketplace for the Court to require Mr. Lawrence to disclose more definite intentions than those he has disclosed in his Schedule 13D Disclosure and Amendment Nos. 1-4 thereto. *See Electronic Specialty Co.*, 409 F.2d at 948; *Liberty National*, 734 F.2d at 567. This lawsuit is solely the product of Denny Bottorff's efforts to use CapStar's corporate resources to harass and burden Mr. Lawrence in an effort to maintain his own economic interest in protecting his position at the bank.

18

Accordingly, the Court should find that CapStar does not have a private right of action for monetary damages or injunctive relief requiring divestiture of shares. Additionally, the Court should find that CapStar has failed to state a claim for injunctive relief requiring amendment of Mr. Lawrence SEC filings at issue here. The Court should, therefore, dismiss CapStar's Section 13(d) claims.

## II. CAPSTAR DOES NOT HAVE A PRIVATE RIGHT OF ACTION UNDER THE CHANGE IN BANK CONTROL ACT OF 1978.

The Change in Bank Control Act of 1978, 12 U.S.C. § 1842(d) ("CBCA"), was intended as a general public welfare statute and resulted from Congress's concern over the "undue concentration of control of banking activities," "not with the well-being of national banks, bank holding companies or their shareholders." *Marx v. Centran Corp.*, 747 F.2d 1536, 1549 (6th Cir. 1984) (citations omitted). The Act provides, generally, that the Federal Reserve Board may not approve an individual or bank holding company's application to acquire a controlling interest in a bank under certain circumstances and creates a legislative and regulatory scheme governing the authority of the Federal Reserve Board and the remedies available to the Federal Reserve Board to enforce its authority. *Id.*

CapStar's second cause of action against Mr. Lawrence asserts that Mr. Lawrence violated the CBCA by not filing a notice seeking approval from the Federal Reserve before crossing the ten percent (10%) ownership threshold. CapStar's CBCA claim fails as a matter of law because there is no private right of action for banks to bring claims under the CBCA. [5]

---

[5] Although not necessarily for consideration of this Motion to Dismiss, CapStar's claim that Mr. Lawrence has not filed a notification of crossing the ten percent (10%) ownership threshold is rendered moot by Mr. Lawrence's filing of the requisite notice on October 26, 2017 (Lawrence Decl., Ex. 6) (which occurred before the filing of this lawsuit) and the Reserve Bank's November 6, 2017 letter (Lawrence Decl., Ex. 7) indicating that Mr. Lawrence's notification appears complete and stating that the Reserve Bank is imposing a 60-day review period, during which it will review Mr. Lawrence's request for approval.

19

The Sixth Circuit made clear in *Marx* that there is no private right of action under the Change in Bank Control Act of 1978. *Id.* at 1550 (*citing Quaker City Nat'l Bank v. Hartley*, 533 F. Supp. 126 (S. D. Ohio 1981)); *see also Lingle v. PSB Bancorp., Inc.*, 123 F. App'x 496, 501 (3rd Cir. 2005) (finding no private right of action under the Change in Bank Control Act and relying on *Quaker City Nat'l Bank* decision); *Texas First Nat'l Bank v. Wu*, 347 F. Supp. 2d 389, 401 (S.D. Tex. 2004) ("Here, Plaintiffs, by and through their original state court counsel, failed to state a claim upon which relief can be granted under the CBCA because the statute does not confer a private cause of action."); *Nat'l Bank of Georgia v. First Nat'l Bank Holding Corp.*, 723 F. Supp. 1501, 1506 (N.D. Ga. 1989) (relying on *Quaker City Nat'l Bank* and *Gianakas* decisions in finding, "as a matter of law, that no private right of action exists under the CBCA."); *Gianakas v. Siensa*, 649 F. Supp. 1033, 1037 (N.D. Ill. 1986) ("[T]he court must conclude that Congress did not intend a private right of action to exist for violations to the CBCA. Therefore, Count I of plaintiff's complaint must be dismissed.").

Accordingly, because CapStar has no private right of action under the Change in Bank Control Act, Count II also fails to state a claim, and should likewise be dismissed.

## III. TENN. CODE ANN. § 45-2-107 IS INAPPLICABLE HERE, AND CAPSTAR'S CLAIMS UNDER THAT STATUTE SHOULD BE DISMISSED AS A MATTER OF LAW.

CapStar's third and final cause of action is a claim under Tenn. Code Ann. § 45-2-107, which provides generally that a "company" may "acquire, form or control a bank" only if it is a federally registered bank holding company. That statute does not prohibit an individual from acquiring, forming or controlling a bank. Tenn. Code Ann. § 45-2-107(a)(3) ("No **company** that is not a bank holding company shall acquire, form or control a bank.") (emphasis added). It only prohibits a "company" from doing so. The statute provides that the term "company" has the

meaning set forth in subsection 2(b) of the Bank Holding Company Act of 1956, 12 U.S.C. § 1841(b). Tenn. Code Ann. § 45-2-107(a)(1)(D). The Bank Holding Company Act of 1956 defines "company" as "any corporation, partnership, business trust, association, or similar organization, or any other trust …, and shall not include a qualified family partnership." 12 U.S.C. § 1841(b).

Here, as demonstrated by the Schedule 13D Disclosure and Amendment Nos. 1-4, as well as the October 26, 2017 notification to the Federal Reserve, Mr. Lawrence has purchased all of the CapStar shares at issue here individually, and not directly or indirectly through any other entity. (Schedule 13D Disclosure, Lawrence Decl. Ex. 1, Item 3; Amendment No. 1, Lawrence Decl. Ex. 2, Item 3; Amendment No. 2, Lawrence Decl. Ex. 3, Item 3; Amendment No. 3, Lawrence Decl. Ex. 4, Item 3; Amendment No. 4, Lawrence Decl. Ex. 5, Item 3; Notification, Lawrence Decl., Ex. 6, p. 3 n. 6.) As demonstrated by those filings referenced but not attached to the Complaint, Mr. Lawrence personally owns 100% of the beneficial interest in the CapStar stock. Mr. Lawrence is not a "company" as defined by either Tenn. Code Ann. § 45-2-107(a)(1)(D) or the Bank Holding Company Act of 1956, 12 U.S.C. § 1841(b). Accordingly, because Mr. Lawrence purchased and owns the CapStar shares individually, Tenn. Code Ann. § 45-2-107 is inapplicable. CapStar, therefore, also fails to state a claim for relief under Tenn. Code Ann. § 45-2-107.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant this Motion to Dismiss, enter an order dismissing the claims set forth in CapStar's Complaint with prejudice, and award Defendants such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

_/s/Christopher E. Thorsen_
John S. Hicks (BPR # 10478)
jhicks@bakerdonelson.com
Christopher E. Thorsen (BPR # 21049)
cthorsen@bakerdonelson.com
Austin K. Purvis (BPR # 32329)
apurvis@bakerdonelson.com
BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.
Baker Donelson Center, Suite 800
211 Commerce Street
Nashville, TN  37201
(615) 726-5600

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2017, I electronically filed a copy of the foregoing *Memorandum in Support of Motion to Dismiss* with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to all parties registered with the Court's electronic filing system.

Steven A. Riley
James N. Bowen
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sriley@rwjplc.com
jimbowen@rwjplc.com

WACHTELL, LIPTON, ROSEN & KATZ
Stephen R. DiPrima
Scott Stevenson
Adam Sowlati
51 West 52nd Street
New York, New York 10019-6150
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

_/s/Christopher E. Thorsen_
Christopher E. Thorsen

22